IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 1, 2024

## IN RE CHARLES B.[1]

**Appeal from the Juvenile Court for Van Buren County**
**No. 1117      Ryan J. Moore, Judge**

_____

### No. M2024-00360-COA-R3-PT

_____

Mother and Father appeal the termination of their parental rights. As to Mother, the trial court found three grounds for termination: substantial noncompliance with a parenting plan, persistent conditions, and failure to manifest an ability and willingness to assume custody. Regarding Father, the trial court found four grounds for termination: severe child abuse, imprisonment for two years for conduct qualifying as severe child abuse, imprisonment for ten years when the child is under eight years of age, and failure to manifest an ability and willingness to assume custody. The trial court also determined that terminating each parent's rights was in the child's best interest. The trial court properly determined that a termination ground existed as to each parent and that terminating each parent's rights was in the child's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KENNY W. ARMSTRONG, JJ., joined.

J. Brad Hannah, Smithville, Tennessee, for the appellant, Michael C.

J. Patrick Hayes, Cookeville, Tennessee, for the appellant, Lisa T.

Macey D. Gurley, Sparta, Tennessee, guardian ad litem for the minor child, Charles B.

Jonathan Skrmetti, Attorney General and Reporter; and Mara L. Cunningham, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

---

[1] It is the policy of this Court to protect the privacy of children in parental termination cases by avoiding the use of full names.

# OPINION

## I.

On February 16, 2023, the Tennessee Department of Children's Services (DCS) filed a petition to terminate the parental rights of Charles B.'s biological parents, Lisa T. (Mother) and Michael C. (Father). The Juvenile Court for Van Buren County held a hearing on DCS's petition and terminated Mother's and Father's parental rights. This appeal concerns each parent's objections to the trial court's decision to terminate their respective rights.

Charles was born on July 6, 2008, in Minneapolis, Minnesota. Mother and Father were never married. When Charles was born, Father brought a paternity action in Minnesota state court to establish his parental rights, and, based on genetic testing, the court declared Father to be Charles's biological father. In the same order, the Minnesota court instructed Father to pay Mother approximately $350 per month in child support. The court attempted to ensure that this support would be forthcoming by ordering income withholding from Father's future wages, but the record does not confirm exactly how much child support, if any, Father has paid during Charles's life. Father has not been involved in Charles's life.

Father has a disturbing criminal history. He committed sexual offenses against three minor children between 1996 and 2013 and has been convicted of three counts of criminal sexual misconduct.[2] Father's first conviction for sexual misconduct with a minor arose from conduct in 1996. Father pleaded guilty to one count of first-degree criminal sexual conduct after admitting under oath that he had "sexual intercourse," "oral intercourse," and "anal intercourse" with an eight-year-old girl.[3] Father's conviction for this offense resulted

---

[2] DCS presented detailed records of Father's criminal history to the trial court, which were accepted as a collective exhibit. The collective exhibit of Father's criminal record is voluminous, containing hundreds of pages of documents from Minnesota state courts that, when taken in the aggregate, account for five volumes of the appellate record. These documents include graphic details of Father's past actions, but we need not consider many of those details to fully evaluate the appropriateness of the termination of Father's parental rights. Accordingly, this opinion only includes those details that are necessary to ascertain whether Father's past actions are similarly prohibited by the Tennessee statues relevant to the cited grounds for termination.

[3] Father's convictions stem from violations of Minnesota's Criminal Sexual Conduct statutes. Minnesota's first-degree criminal sexual misconduct statute, Minnesota Statutes Annotated section 609.342, was not materially changed between the date of Father's convictions in 1996 and in 2012. *Compare* 1995 Minn. Sess. Law Serv. Ch. 186, § 99 (effective May 18, 1995, to Apr. 6, 1998) (detailing the language of the statute at the time of Father's first conviction) *with* Minn. Stat. Ann. § 609.342.1 (effective Aug. 1, 2007, to July 31, 2019). At all times relevant to this appeal, Minnesota state law provided that

A person who engages in sexual penetration with another person, or in sexual contact with

in an 86-month prison sentence accompanied by five years of conditional release, which expired on September 19, 2006. Father's second conviction for sexual misconduct with a minor related to conduct that occurred in 2012. Father pleaded guilty to one count of first-degree criminal sexual conduct after he had sexual intercourse with his then girlfriend's twelve-year-old daughter, which resulted in pregnancy. Father's conviction for this offense resulted in a 153-month prison sentence. Finally, Father's third instance of sexual misconduct with a minor took place in 2013, several months after his second instance of sexual misconduct. Father was convicted of one count of second-degree criminal sexual conduct after inappropriately touching his then-girlfriend's other daughter, who was eleven years old.[4] Father's conviction for this offense resulted in a 119-month prison sentence, and the sentencing court ordered this sentence to run concurrently with his 2012 sentence.

Father's criminal history is not limited to these three instances of sexual misconduct with minor children. While ordering Father to indefinite civil commitment, a Minnesota

---

a person under 13 years of age as defined in section 609.341, subdivision 11, paragraph (c), is guilty of criminal sexual conduct in the first degree if any of the following circumstances exists:

(a) the complainant is under 13 years of age and the actor is more than 36 months older than the complainant. Neither mistake as to the complainant's age nor consent to the act by the complainant is a defense;

. . .

(g) the actor has a significant relationship to the complainant and the complainant was under 16 years of age at the time of the sexual penetration. Neither mistake as to the complainant's age nor consent to the act by the complainant is a defense;

. . . .

Minn. Stat. Ann. § 609.342.1; *see also* 1995 Minn. Sess. Law Serv. Ch. 186, § 99.

[4] According to Minnesota's second-degree Criminal Sexual Conduct statute as it existed at the time of Father's third conviction,

A person who engages in sexual contact with another person is guilty of criminal sexual conduct in the second degree if any of the following circumstances exists:

(a) the complainant is under 13 years of age and the actor is more than 36 months older than the complainant. Neither mistake as to the complainant's age nor consent to the act by the complainant is a defense. In a prosecution under this clause, the state is not required to prove that the sexual contact was coerced;

. . . .

Minn. Stat. Ann. § 609.343.1 (effective Aug. 1, 2007, to July 31, 2019).

state court also provided information about Father's non-sexual criminal history. According to the collective exhibit, Father's other convictions concern: (1) disorderly conduct in 1996, stemming from Father "put[ting] a knife to the throat of an adult female co-worker because she made him mad"; (2) leaving the scene of an accident in 1996; (3) driving after revocation in 2001; and (4) "several convictions for driving after suspension and cancellation between 2001 and 2013."

During the criminal sexual misconduct proceedings, Minnesota state officials interviewed Father to assess, among other things, his potential need for inpatient treatment or civil commitment, his likelihood of re-offending, and his mental health. In each instance, officials flagged Father as someone who posed a serious risk to the public and posed a serious risk of reoffending. In 2023, while Father was still serving his concurrent sentences, the Minnesota judiciary designated Father a "sexually dangerous person" and enrolled him in the state's sex offender program. As part of this enrollment, the state placed Father in an indefinite civil commitment facility located in Moose Lake, Minnesota. As far as this court is aware, Father continues to reside at the Moose Lake facility.

Mother raised Charles. They lived together in Minnesota for most of Charles's childhood. While still there, Mother married Wayne T. (Stepfather), who took on a significant role in Charles's life. Then, in 2020, the family of three moved to Spencer, Tennessee.

Charles appeared on DCS's radar on November 8, 2021. That day, law enforcement informed DCS that Stepfather called 911 to report "domestic violence in progress." According to Charles, who provided this testimony during the final hearing in this case, the altercation began when

> [Mother and Stepfather] started arguing. Usually the cops get involved. So I was thinking, let me grab my phone, let me record, because, you know, sometimes the true story don't come out. So I was like if something goes bad, I can record and, you know, make sure nobody gets hurt. Trying to think for all of us. So I lay down on a dog bed and they're arguing and I put it on my chest and . . . then I hit record because it starts getting bad. So it's on my chest, they start arguing, it started to get bad, you know, grabbing on each other, you know, kind of getting out of hand, and then just she comes over, you know, she grabbed my phone and typically I grab it back, trying to pull back. I don't know what I did. And she put it – she rips it from me and put it in her pocket. And I just stop. That's – then she starts grabbing all over me and that starts happening.
>
> . . .
>
> I was taken outside through the living room to the back area where the

- 4 -

laundry room is out that door [(referencing a video exhibit presented at trial)]. It is really blurry and it's really faint. It's really something you've got to see to really believe. But at one point she has my ears and you can – I wish I had my phone where I could show a picture that's more clear. But she has my ears at one point and you could see where I try to fight back and about rip that arm off and then it goes – you can barely see my ear and it is down below my ear to where she's got my neck. . . . Just [indicating] choke. Just couldn't breathe. . . . I couldn't breathe. . . . [S]he's kind of pushing really hard and I'm yelling and then at one point she takes my hand and covers my mouth and my nose so I couldn't breathe but I wouldn't stop screaming and probably a minute or so [Stepfather] comes in there finally with the camera again and she leaves and he's holding the door. I'm coughing and then after that – it's not on video – but she comes back, breaks the door and I'm in the bathroom on the corner of the tub and started talking, telling me she needs help. She says it's a game. Cops arrive.

DCS obtained information that corroborated Charles's recollection. DCS explained in its petition to declare Charles a dependent and neglected child, which was entered as an exhibit at trial without objection, that

Case Manager Alicia Cantrell ("CM Cantrell") initially spoke with deputy Logan Frady ("Deputy Frady") with the Van Buren County Sheriff's Department who stated that he had been dispatched to the home for domestic violence in progress. Upon arrival, Deputy Frady spoke to [Stepfather] who reported that [Mother] had locked herself and the child in a bathroom. Due to reports that [Mother] was searching for a weapon prior to the arrival of Deputy Frady, Deputy Frady ordered [Mother] to come out of the bathroom with her hands up. After four times being ordered to come out with her hands up, [Mother] came out of the bathroom and was detained. [Stepfather] and the child provided statements and videos were provided to Deputy Frady that [Stepfather] had taken of [Mother] assaulting the child. According to Deputy Frady, one of the videos showed [Mother] placing her hands around the child's neck while hitting him multiple times in the head. [Mother] was arrested and charged with aggravated assault and domestic assault.

Following the arrest, DCS interviewed Mother and Charles. Charles told DCS during his interview that Mother

became upset with [him] . . . "jerked" the phone away [and] then proceeded to grab his arms; dragged him across the living room and took him outside the home. While outside, . . . [Mother] hit [him] in the head and placed her hands over his mouth and nose, preventing him from breathing. [He] said that [Stepfather] did not intervene for fear that [Mother] would "throw herself

- 5 -

down" and "turn it around on [Stepfather]." [He] said that [Mother] is "mental" and had "a lot of anger issues" . . . [and] "loses her mind" a lot.

Charles also showed DCS officials "several scratches and markings on [his] left hand, forearm, and left leg" from the incident during his interview.

Mother offered a different recollection of events. She told DCS that Stepfather "is abusive toward her . . . had physically and verbally assaulted her on multiple occasions; and had threatened to kill her . . . and has threatened to drive the family off a mountain to kill them all." She blamed Stepfather for causing this incident, denying that she was the aggressor. Mother objected to any plan that might place Charles in Stepfather's custody, and DCS respected her wishes. Mother also maintained that none of the injuries that Charles sustained should be construed as examples of child abuse or domestic violence. Although the record does not contain additional details, all parties agree that, shortly before the final hearing in this case, Mother was acquitted of the domestic violence criminal charge.

Based on the information it received from Charles and Mother, DCS filed an emergency motion to place Charles in state custody as well as a separate petition to declare Charles a dependent and neglected child. The Juvenile Court for Van Buren County reviewed the allegations, made a finding that there was probable cause to believe that Charles was dependent and neglected, and, based on that finding, granted DCS's emergency motion for custody. Charles was immediately placed into DCS's custody at this time, and the Juvenile Court also appointed a guardian ad litem to represent Charles's interests. Upon obtaining custody, DCS placed Charles into a foster home overseen by Omar W. (Foster Father), and Charles remained in that placement while DCS continued to prosecute the dependency and neglect proceedings.

Before the end of the year, the trial court held an adjudicatory hearing on DCS's dependency and neglect petition. Mother, who had up until this time maintained that she did not engage in any criminal conduct on November 8th, did not categorically deny DCS's allegations in the dependency and neglect petition. Instead, Mother neither admitted nor denied the statements contained therein, including allegations that her conduct amounted to domestic violence. The court, having heard credible testimony from DCS and, apparently, no countervailing proof from Mother, made findings of fact consistent with DCS's understanding of events and found Charles to be a dependent and neglected child as that term is defined in Tennessee Code Annotated section 37-1-129, though the trial court did not conclude that Charles was the victim of severe child abuse. Mother did not appeal the Juvenile Court's findings or its conclusion that Charles was a dependent and neglected child. Furthermore, consistent with Tennessee's child support guidelines, the Juvenile Court ordered Mother to pay $65 per month in child support, including retroactive support, while Charles remained in DCS's custody.

- 6 -

Several months later, the trial court held a separate hearing concerning Father and whether Charles was dependent and neglected in the context of Father's absence from his life due to his incarceration. The Juvenile Court, having heard proof that Father remained incarcerated in Minnesota due to his multiple sexual misconduct convictions, entered an order finding Charles to be dependent and neglected by Father as well. Father also did not appeal the trial court's dependency and neglect order.

The Juvenile Court eventually endorsed a permanency plan that placed obligations on Mother and Father. DCS did not advance Father's noncompliance as a ground to terminate his parental rights. The parties agree that Father's noncompliance with the terms of the permanency plan is not at issue in this appeal. Accordingly, in analyzing compliance with the permanency plan, we address the requirements placed on Mother by the Juvenile Court.

Mother's permanency plan required her to: (1) resolve all pending and current criminal charges; (2) "openly and honestly" participate in a psychological evaluation, including following through on any recommendations from the treating psychologist and releasing her medical records to DCS following her evaluation; (3) participate in family counseling with Charles; (4) "openly and honestly" participate in a clinical parenting assessment, including following through on any recommendations from the assessor; (5) complete parenting classes and use the skills obtained from those classes to improve family counseling visits; (6) create a budget, obtain a legal means of income, and verify her employment with DCS; (7) maintain appropriate housing, regularly informing DCS of her living conditions including a mandatory requirement to inform DCS of any living condition changes "within 72 hours"; and, (8) arrive on time for and fully engage in scheduled visitation with Charles.

Regarding the psychological evaluation requirement, Mother did participate in a psychological evaluation, but her evaluator struggled to offer detailed recommendations as a result of complications in communicating with Mother due to limits on her openness. Mother indicated that any failure to be open was a result of her ongoing criminal charges. After being informed of this result, the Juvenile Court ordered Mother to engage in a second psychological evaluation. The Juvenile Court also imposed a new condition that Mother "openly and honestly participate in domestic violence counseling as the aggressor." Mother vehemently opposed this modification and refused to engage in any domestic violence classes, asserting that any such participation that was not labeled participation as a victim would be used against her in her criminal trial. When the Juvenile Court ratified Mother's parenting plan, it found that each imposed requirement contributed towards a primary goal of reuniting Charles with at least one parent and exiting DCS's custody. The Juvenile Court found that the permanency plan was in Charles's best interest.

Charles stayed in Foster Father's home from November 10, 2021, until June 2022. According to multiple reports, Charles struggled to cope with the trauma he endured from

the events of November 8, 2021. This led to, among other things, angry outbursts, poor academic performance, and friction between Charles and Foster Father. Foster Father tried to work with Charles to improve but was unsuccessful. These efforts ultimately had to be set aside when, in June 2022, Foster Father learned that another child in his foster home sexually assaulted Charles. Foster Father immediately informed DCS of this incident, and the offending foster child was promptly removed from Foster Father's home. However, this incident only exacerbated Charles's existing trauma. DCS concluded that Charles's placement should change. Accordingly, DCS transferred Charles to Lebanon Academy, a treatment facility with on-staff therapists dedicated to assisting children like Charles in coping with traumatic events.

At Lebanon Academy, Charles received daily attention from staff and recurring therapy sessions. Charles engaged in two types of therapy: individual therapy between him and staff therapists and family therapy sessions that also included Mother. Multiple individuals who worked with Charles during his time at Lebanon Academy testified at the final hearing in this case, and they unanimously believed that Charles responded positively to his individual therapy. One witness described his progress in individual therapy as "fantastic." His tendencies towards anger lessened over time, and his academic status improved. Charles also eventually became interested in rekindling his relationship with Foster Father, and the Lebanon Academy staff helped facilitate interactions between the two.

Conversely, Charles and the Lebanon Academy witnesses all testified at trial that Charles's family therapy sessions with Mother negatively impacted his recovery and development. The witnesses who testified at the final hearing called these joint sessions "horrible" and "very toxic." They believed that Mother's interactions with Charles during these meetings ranged from manipulative to abusive. One witness reported that Mother, relying on the biblical admonition that a child should obey his parents, pressured Charles to recant his statements regarding Mother's actions on November 8th. On another occasion, Mother allegedly spent much of the session showing pictures of the family's dead animals and blaming Charles for their deaths. Mother reasoned that if Charles had not supported Stepfather in reporting her to the authorities and had not maintained his position throughout the dependency and neglect proceedings, then she would not have spent any time in jail and that the animals would still be alive but for his actions. Many of the joint therapy sessions involved moments where Mother would become irate with the Lebanon Academy staff, blaming them for, among other things, Charles being sexually assaulted during his time with Foster Father. On at least two instances, Mother had to be escorted off the premises. Though each joint therapy session was scheduled to last at least one to two hours, most did not last that long due to Mother's aggressive behavior.

The Lebanon Academy witnesses reported that these joint therapy sessions harmed Charles. For example, at least two witnesses testified that Charles would have "horrible anxiety" after Mother would leave, requiring him to engage in decompression periods.

Sometimes these decompression periods could last as long as a half-hour to a full hour. After the sixth or seventh joint session went awry, one Lebanon Academy official recommended ending joint therapy with Mother because it was negatively impacting Charles's ongoing recovery. Based on this recommendation, DCS petitioned the Juvenile Court to end joint counseling. The Juvenile Court agreed, finding that the joint therapy sessions were "detrimental to Charles's wellbeing."

Mother exhibited similar behavior whenever she met with school officials about Charles's in-school performance. Charles has an individualized education plan (IEP), and Mother would meet with DCS officials and school officials regularly to assess his progress under the plan throughout the pendency of this case. However, as was true in the context of the Lebanon Academy group therapy sessions, Mother spent almost all the meeting time verbally attacking members of DCS and school staff, blaming them all for Charles's poor performance and general struggles.

On February 16, 2023, DCS filed a petition to terminate Mother's and Father's parental rights to Charles. DCS raised multiple grounds for termination for each parent. Concerning Mother, DCS asserted that she had failed to substantially comply with the terms of her permanency plan, that she had failed to remedy the conditions that warranted Charles's removal from her custody and that those conditions persisted at the point of filing, and that she failed to manifest a willingness and ability to assume custody of Charles. Concerning Father, DCS asserted that his parental rights should be terminated based on his past instances of severe child abuse with children in Minnesota, his prison sentences, and his own failure to manifest an ability and willingness to assume custody of Charles.

By June 2023, Charles had made tremendous progress at Lebanon Academy, and this progress enabled him to consider leaving the facility. Charles originally expressed some interest in getting to know Father, but that interest faded after Charles independently searched online for information and learned about Father's criminal history. Instead, Charles requested the opportunity to return to Foster Father and live with him, which DCS respected. Since returning to Foster Father's home, Charles reportedly has not exhibited the original issues he had the last time that he was in Foster Father's care. His angry outbursts are down to a minimum, and his academic standing continues to improve. Charles has remained in Foster Father's care since June 2023.

The Juvenile Court held a final hearing on December 15, 2023. Mother participated in this hearing in person while Father participated remotely from Minnesota. DCS offered Father's entire criminal record into evidence as a collective exhibit. The Juvenile Court also heard from multiple witnesses, including: (1) the DCS case worker who oversaw Charles's progress; (2) Charles; (3) several past and present employees of Lebanon Academy who participated in Charles's recovery; and (4) Mother. Neither Father nor Foster Father testified at the final hearing.

According to the DCS representative, Jamesia Evans, Mother spent most of her time after the permanency plan was ratified working against rather than cooperating with DCS. Wherever the plan required Mother to disclose information, such as employment, housing, and medical records, Mother refused. Ms. Evans conceded that Mother participated in a psychological evaluation in December of 2021 but noted that Mother's evaluator felt unable to give full recommendations due to Mother's lack of open communication. Emphasizing that Mother was ordered to complete a second psychological evaluation, Ms. Evans testified that Mother has not provided DCS with any proof that she completed such an assessment. She testified that the requirement in the permanency plans to complete psychological evaluations was "very important," as DCS wanted to "make sure that we're assessing any type of untreated or undiagnosed mental health issues." Regarding the requirement that Mother complete domestic violence classes, Ms. Evans acknowledged that Mother was acquitted of her domestic violence charge. She insisted, however, that Mother should nevertheless have completed the court-ordered domestic violence classes. She pointed out that, even though Mother was acquitted of the domestic violence criminal charge against her shortly before trial, Mother did not contest the allegations of domestic violence made against her at the dependency and neglect stage and did not appeal the dependency and neglect order, which included findings about her engaging in actions that qualify as domestic violence. Based on that understanding, Ms. Evans maintained that domestic violence classes would have helped Mother. She also disagreed with Mother's previously stated position that taking domestic violence classes would have negatively impacted her criminal case, representing that Mother had previously been told by the court during one of the prior permanency plan hearings that the domestic violence classes would not be used against her in criminal court. Concerning Mother's criminal charges generally, Ms. Evans maintained that Mother's acquittal did not fully resolve all her pending criminal charges, stating that Mother remained charged with at least one or two disorderly conduct offenses at the time of the final hearing.

Concerning the other permanency plan requirements, Ms. Evans noted that Mother's belligerence at Charles's joint therapy sessions undermined their effectiveness. Ms. Evans also revealed that she had to petition the court for a restraining order preventing Mother from interacting with Foster Father, suggesting that Mother had previously engaged in hostile conduct toward him.

Concerning the persistent conditions ground, Ms. Evans noted that some of the requirements in Mother's permanency plan, such as the updates on Mother's living condition, reflected an understanding that Mother's living arrangements at the time of her separation from Charles were inadequate. She testified that DCS inspected Mother's Tennessee home following the separation and that it was not an adequate living environment. She stated that animal hair, feces, and, in some instances, remains, were present inside and outside Mother's Tennessee home. Specifically, Ms. Evans testified that she had to "step over urine and feces" during her inspection of Mother's Tennessee home. Ms. Evans also noted that the room where Charles was supposed to sleep essentially

appeared overrun with boxes and other items, making it nearly impossible for Charles to occupy that space. Additionally, regarding Mother's support for Charles since their separation, Ms. Evans recognized that Mother has continued to meet the court-ordered child support obligation but opined that she believed Mother's support was still insufficient to meet Charles's needs. Ms. Evans stated, "[S]he's paid child support for this child. But if you're raising your own child, you're doing more than just paying $65 a month . . . clothing is part of that. Books for school is part of that. I mean, she could have bought a backpack. She could have bought pens. She could have bought pencils. She's done none of that. We have asked for those things, but she's not provided them."

Concerning Father, DCS relied heavily on his extensive criminal record at the final hearing. Ms. Evans conceded during cross-examination that DCS did not attempt to facilitate contact between Charles and Father but testified that she felt that this was warranted under the circumstances. To support her view, Ms. Evans read into the record the following findings from interviews Father completed following his various convictions:

> Diagnostic impressions, Axis 1, pedophilia severe, sexually attracted to adult and child females nonexclusive type. I think that's malingering of marked severity, PTSD, residential/nonclinical symptoms, severe sexual abuse of a child, antisocial personality disorder, severe with extensive psychopathic features. Next one says, see medical history section of report. The next one is marked severe unresolved pedophilia and antisocial personality disorder/psychopathy. Severe pending criminal charge. Next one says, current GAF 45 to 50 serious impairment, highest GAF in past year 40 to 50, serious impairment.
>
> . . .
>
> [Father's] prognosis or resolution or independent management of his aforementioned psychiatric illness and personality disorder is extremely poor. His future prognosis will depend upon his adjustment to longitudinal incarceration, completion of correctional-based sex offender treatment, and immediate accountability for any inappropriate behavior, including attempts to malinger, medical and/or psychological illness to thwart treatment or project blame on others for failed treatment completion.

Noting Father's continued placement at Moose Lake, Ms. Evans categorically rejected any suggestion that Father could appropriately and feasibly care for Charles. Instead, she supported Charles remaining in Foster Father's care. While Ms. Evans acknowledged that Charles had been subjected to a sexual assault while in Foster Father's care in the first instance, she emphasized that the offending child had been removed from the premises and testified that Charles has since developed an almost parental attachment to Foster Father. She explained that she has seen Charles call Foster Father "dad" on at least one occasion.

Next, Charles took the stand. After addressing Mother's acts of physical violence toward him, Charles introduced a handwritten letter into evidence explaining his perspective on the parental termination case and his desired outcome. In this letter, Charles wrote,

Dear reader[,] what I want to happen is I want to stay with [Foster Father] and would like to be adopted by him[.] I would still talk to my mom and love her but she would not have rights anymore[.] My mom had me [for] 13 years and in six months [Foster Father has] done more for me and showed more love than in 13 years[.] He never let anyone hurt me after [the other foster child.] He protected me[.] He sent me to Lebanon [Academy] out of love and wanted me to get help with my anger and behavior and even took me back after everything I did and still shows me a lot of love and I love him with all my heart.

Mother's counsel pressed Charles on cross-examination, suggesting that he did not write this letter until after being encouraged to do so by DCS. Charles rejected that characterization. Instead, he explained that, in the past, he "used to be scared to testify and talk" and that he thought memorializing his thoughts in a written format would help him present his opinion. When asked about his current feelings about Mother, Charles explained that he still loves Mother and that he was willing to forgive her for what she did to him, but also that he would never forget what she did to him and that "a lot" would have to change about her attitude and behavior for him to ever feel comfortable interacting with Mother again in the future. Regarding his continued arrangement living with Foster Father, Charles stated that he "loves" said arrangement and "couldn't ask for anything better." He explained that Foster Father shows him just as much love and affection as the other children residing in his foster home, that Foster Father took him on various outings, and stated that Foster Father never yelled at him "unless there was a need when I was a knucklehead." Consistent with his letter, Charles reiterated his desire to be adopted by Foster Father following the termination of Mother's and Father's parental rights.

Charles also testified as to other prior instances of what could be termed child abuse or domestic assault perpetrated by Mother prior to DCS becoming involved. Charles recounted one instance that occurred while the family still lived in Minnesota during which Mother allegedly hurt him with a horsewhip:

Q. Were there instances that your mother physically struck you or disciplined you in an extreme manner above and beyond the videos that were shown in court today?

[Charles:] Yes.

- 12 -

Q. What did she do?

[Charles:] There's one time, I don't remember what I did, but she had, like, a horse-type, you know, whip and I was like running away from her and running around a little skid steer-type tractor that's got a forklift-type stuff on it and I'm running around it and she swung it around it and it caught me across the face. I had a slash across my whole –

Q. Did she do it to intentionally strike you or was that by accident?

[Charles:] She swung it. So I think –

Q. She swung it at you?

[Charles:] Yeah.

Q. When was that?

[Charles:] That was – I don't remember the exact date or year, but I know it was a long – it was when we were still living in Minnesota.

The court then heard testimony from several witnesses who helped oversee Charles's therapy while he was at Lebanon Academy. They agreed that Mother essentially thwarted every family therapy session that the staff members were supposed to have with her and Charles. Justin Donnelly, one of Charles's therapists, stated that he personally recommended ending the family therapy sessions because he felt that the sessions had "no therapeutic benefit" based on Mother's behavior. Another clinician at Lebanon Academy, Karolyn Getty, testified that sometimes Mother would also question Charles's basic intelligence levels during family therapy sessions as another manipulation tactic and that this practice negatively impacted Charles's recovery and development. Contrasting with those experiences, Ms. Getty testified that all the interactions she has witnessed between Foster Father and Charles have been "very positive," and supported the idea of Foster Father eventually adopting Charles. All three of the Lebanon Academy witnesses conceded on cross-examination that they did not try to engage with Father or involve him in Charles's continued care.

Finally, Mother testified. Regarding the requirements of her permanency plan, Mother emphasized that she attempted to complete a psychological evaluation immediately after being released from jail. Mother then tried to present certificates from two parenting classes that she claimed to have completed, including one from March 2022 and one from November 2022, but the court excluded both certificates because they were not accompanied by a statement of authenticity by the custodian of those documents. Mother testified that she did not provide evidence of her employment to DCS because, she

believed, the plan only required her to submit evidence of W-2 income and that she did not earn any W-2 income. Instead, Mother testified that she is self-employed and only received approximately $1,250 per month in 1099 income. Mother denied any suggestion that DCS had asked her for evidence of 1099 income, which Ms. Evans disagreed with during rebuttal testimony. Mother also testified that her living situation has not changed from what it was when she lived with Charles, meaning she did not, in her view, have to disclose any additional information to DCS concerning her standard of living.

Mother acknowledged that she was frustrated with DCS and testified that much of her frustration stemmed from the fact that, allegedly, DCS failed to inform her for nearly two weeks that Charles had been sexually assaulted in Foster Father's care. During rebuttal, Ms. Evans denied withholding this information from Mother, calling it a "blatant lie." Ms. Evans testified that she regularly communicated with Mother throughout the pendency of this case, and specifically during Charles's transition to Lebanon Academy about the sexual assault in Foster Father's foster home.

Mother also rejected the notion that she was using the Bible to engage in religious manipulation during joint therapy sessions, stating instead that she only intended to teach Charles about the book of Revelation. She maintained that she brought a Bible to the joint therapy sessions because Charles allegedly told her that he wanted a Bible. Mother testified that she felt "attacked for anything [she] believe[s] in," that DCS did nothing to help her with her permanency plan, that DCS wanted her to fail, and that DCS "want[s] to take [her] kid."

On cross-examination, Mother walked back some of her prior testimony. Regarding her housing, Mother stated that the only reason she still owns the Tennessee house is that her divorce proceedings with Stepfather were still pending. Mother indicated that she cannot reside in the Spencer, Tennessee house due to a restraining order having been filed while Mother's divorce is resolved on appeal. She also admitted, contrary to her direct examination testimony, that she does not live in Tennessee and instead has moved back to Minnesota. Mother testified that when she visits Tennessee she has to either obtain lodging in a hotel or stay with friends.

Charles's Guardian ad Litem asked Mother about her sense of personal responsibility and whether and why she believes taking custody of Charles would be in his best interest. Mother responded by stating: (1) that she was wrongly labeled an aggressor in the context of her domestic violence charges; (2) that she does not believe any of the physical actions she took on November 8, 2021, constitute abuse; (3) that she took personal responsibility for anything that occurred by engaging in the criminal trial process; and, (4) that Charles "should leave with [her] right now because I have been proven not guilty of the charges that you made up."

The Juvenile Court entered an order terminating Mother's and Father's parental

rights to Charles on February 6, 2024. As part of its findings, the trial court made several credibility findings. The court found Charles's case manager at DCS credible, found each of Charles's therapists at Lebanon Academy either "credible" or "very credible," and found that Charles was "very credible," noting that the court appreciated "his honesty and his braveness" in testifying. Conversely, the court found Mother not to be credible. The trial court based this conclusion in part on the back and forth that Mother and Ms. Evans had during their respective testimony regarding Mother's need to report her income, finding that there were multiple requests made to produce the type of 1099 income that Mother said DCS never once requested from her. The court also stated that "it seems like it comes back to it is everyone else's fault. According to [Mother,] it is Ms. Evans'[s] fault, it is the Court's fault, it is Lebanon Academy's fault, and [Mother] does not want to take responsibility for her actions. The Court does not find her testimony credible."

The trial court made further pertinent findings of fact. These findings of fact were consistent with the testimony of Ms. Evans, Charles, and the Lebanon Academy witnesses. The trial court found that DCS met its burden to prove each termination ground levied against each parent by clear and convincing evidence.

Concerning the substantial noncompliance ground,[5] the court found as to Mother: (1) that every step of the parenting plan is important to its overall operation; (2) that joint counseling sessions between Mother, Charles, and Lebanon Academy staff "broke down"; (3) that Mother was unwilling to exercise proper parenting skills during the family therapy sessions, contravening the court's previous directive to do so; (4) that Mother "did not complete a parenting assessment per the Department's request [and if] she did complete any type of parenting assessment, Ms. Evans was unaware of that because a release would not be signed by [Mother]"; (5) that Mother failed to produce proof of income, her current housing status, or a second psychological evaluation; and, (6) that, if Mother were still living at her house in Spencer, Tennessee, such housing "was inappropriate" due to the testimony about "urine and feces."

Concerning the persistent conditions ground, the court found as to Mother the following:

> Charles has been removed from the custody of [Mother] for more than six months by a court order entered in a proceeding in which a petition has been filed in the Juvenile Court alleging that the child is dependent and neglected. The conditions that lead to the removal of the child from the custody of [Mother] still persist, preventing the child's safe return to the care of

---

[5] As noted above, DCS did not raise substantial noncompliance as a ground to terminate Father's parental rights. DCS acknowledges that the trial court's final order at one point states that both Mother and Father, as opposed to just Mother, engaged in substantial noncompliance with the terms of the permanency plan. The trial court's analysis is solely related, however, to Mother. We agree with DCS that this is a mere scrivener's error on the part of the trial court.

[Mother], and other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of [Mother]. There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to [Mother] in the near future. The continuation of the parent and child relationship greatly diminishes the child's chance of an early integration into a safe, stable, and permanent home.

The trial court noted Mother's violence toward Charles. The trial court also noted a lack of completion of the psychological evaluations and domestic violence classes, and failure to provide budgeting, employment information, and safe living space. The trial court indicated that all these deficiencies support an adverse finding against Mother on this ground. Furthermore, the trial court also noted Mother's hostile actions towards Foster Father. The trial court observed that Mother's actions towards Foster Father necessitated a non-contact order, and the trial court concluded that her behavior constituted further indication that she poses a continuing risk to Charles.

Concerning the failure to manifest ground, the court noted that Mother's failure to abide by the requirements of the permanency plan and failure to remedy the conditions that warranted her original separation from Charles supported this ground. The court also referenced Charles's testimony and the videos submitted into evidence and concluded that, taken together, returning Charles to Mother's care posed a substantial risk of harm to Charles.

As for Father, regarding the severe child abuse ground, the trial court found that Father's three convictions for criminal sexual conduct, all of which involved minor children, each supported a finding that Father had severely abused a child. As for the two imprisonment grounds, the court noted that Father had been convicted of crimes and sentenced under those convictions to prison sentences that met the requirements for each ground for termination. Specifically, the court noted that Father's 2012 and 2013 prison sentences both independently fell within Tennessee Code Annotated section 36-1-113(g)(5), as they each lasted for more than two years and stemmed from a finding that Father severely abused a child. As for the Tennessee Code Annotated section 36-1-113(g)(6) termination ground, the court observed that a prison sentence longer than ten years accrued while Charles was less than eight years old. Finally, concerning the failure to manifest ground, the court observed regarding Father that he did not enable DCS to work with him during his time at any Minnesota correctional facility because he "failed to sign any releases." The trial court also referenced Father's indefinite civil commitment and found that placing Charles with Father in that environment would pose a serious risk of abuse, especially given Father has no preexisting relationship with Charles.

Having found grounds for termination of Mother and Father's rights, the trial court next assessed whether termination of parental rights would be in Charles's best interest.

Referring to the statutory best interest factors outlined in Tennessee Code Annotated section 36-1-113, the trial court found that terminating each parent's rights was in Charles's best interest. Concerning Mother, the court found that each best interest factor favored terminating her parental rights to Charles except for factor (I), which concerns "whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, the likely impact of various available outcomes on these relationships, and the child's access to information about the child's heritage," finding that no proof was presented on that factor by DCS. Regarding Father, the court found that factors (A), (C), (D), (E), (J), (N), (O), (P), (Q), (R), and (T) weighed in favor of terminating his parental rights.

Mother and Father have both appealed to this court. Mother raises four issues on appeal: (1) whether the trial court erred in making a finding of substantial noncompliance with regard to Mother's adherence to the permanency plan, (2) whether the trial court erred in concluding that persistent conditions still persisted such that termination was warranted, (3) whether the trial court erred in concluding that Mother failed to manifest an ability and willingness to assume legal and physical custody and also to provide for Charles financially, and (4) whether the trial court's erred in its best interest determination with respect to Mother. Father raises two issues: (1) whether the trial court erred in concluding that Father was confined in a correctional facility or detention facility by court order as a result of a criminal act under a sentence of more than ten years when Charles was eight years old or less, and (2) whether the trial court erred in its best interest determination with respect to Father.

II.

Parents have a fundamental constitutional interest in the care and custody of their own children. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). This fundamental interest is "far more precious than any property right." *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)). "[P]ublic policy strongly favors allowing parents to raise their biological or legal children as they see fit, free from unwarranted governmental interference." *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). However, a parent's rights are not absolute and may be terminated on clear and convincing evidence that statutory grounds for termination exist and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(1)-(2); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013).

In a termination of parental rights case, we review a trial court's findings of fact de novo on the record with a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. R. App. P. 13(d). "In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing

evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). The grounds for termination and the determination that termination is in the child's best interest must be established by clear and convincing evidence, that is, evidence that "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts" and that "eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. Code Ann. § 36-1-113(c). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

III.

The trial court found that the Department established multiple grounds for terminating Mother's and Father's parental rights by clear and convincing evidence. Mother challenges each of the three grounds that the trial court believed justified terminating her parental rights while Father only challenges one of the four termination grounds found as to him. Despite Father's failure to challenge the other three grounds, "in parental termination cases in Tennessee 'waiver does not apply in the context of either the grounds for termination or whether termination is in a child's best interest.'" *See In re Preston H.*, No. M2022-00786-COA-R3-PT, 2023 WL 6793215, at *16 (Tenn. Ct. App. Oct. 13, 2023), *perm. app. denied* (Tenn. Jan. 24, 2024) (quoting *In re Aniyah W.*, No. W2021-01369-COA-R3-PT, 2023 WL 2294084, at *6 (Tenn. Ct. App. Mar. 1, 2023)). The Tennessee Supreme Court has charged this court with responsibility to reexamine each ground on appeal irrespective of whether it has been challenged on appeal. *See In re Carrington H.*, 483 S.W.3d at 525 ("[R]equiring this review will ensure that fundamental parental rights are not terminated except upon sufficient proof, proper findings, and fundamentally fair procedures."). Accordingly, we assess each ground found to support termination by the trial court. We begin our analysis by considering the grounds found against only Mother then move to considering the grounds found against only Father, and conclude by considering the failure to manifest ground, which was found against both parents.

A.  Substantial Noncompliance with Permanency Plan

The trial court found that clear and convincing evidence established that Mother failed to substantially comply with her permanency plan. A ground for termination exists where clear and convincing evidence shows that "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4." Tenn. Code Ann. § 36-1-113(g)(2) (effective July 1, 2022, to May 4, 2023).[6] For substantial noncompliance with the parenting

_____

[6] "This Court applies the versions of the parental termination statutes in effect on the date the

plan to stand as a ground for termination, it must be established that "the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C) (effective April 27, 2022, to June 30, 2023). The Tennessee Supreme Court has indicated that "[c]onditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." *In re Valentine,* 79 S.W.3d 539, 547 (Tenn. 2002). The court must not merely "count[] up the tasks in the plan to determine whether a certain number have been completed." *In re Carrington H.*, 483 S.W.3d at 537. Substantial noncompliance "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Instead, the parent's noncompliance must be "substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *Id*. "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *Id*. Whether noncompliance is substantial is a question of law reviewed de novo. *In re Ethan W.*, No. M2021-01116-COA-R3-PT, 2023 WL 415999, at *6 (Tenn. Ct. App. Jan. 26, 2023) (citing *In re Valentine*, 79 S.W.3d at 548), *perm. app. denied* (Tenn. April 20, 2023).

The permanency plans required Mother to take several steps tied directly to the allegations and circumstances surrounding her behavior on November 8, 2021, namely taking domestic violence classes, engaging in parenting assessments, undertaking two psychological evaluations, using the skills she was learning to improve family visitation, and resolving her outstanding criminal charges. These requirements are tied to the incident that brought DCS into Charles's life and his removal from the home.

Concerning these requirements, Mother refused to take the court-ordered domestic violence classes, citing a concern that taking such classes would be used as evidence of admission in her parallel criminal proceedings despite assurances that it would not. Yet, even after Mother's criminal proceedings concluded, Mother failed to begin the domestic violence course, nor did Mother suggest that the permanency plan should be modified to remove this requirement on the basis of her acquittal. Mother continues to reject any semblance of responsibility or remorse concerning her separation from Charles. Troublingly, Charles provided testimony that Mother had engaged in other abusive acts prior to November 8, 2021. In response to questioning about her actions, Mother deflected blame or denied the magnitude of her conduct, asserting at one point, "I don't think that twisting my son's ear is abuse. Okay? That's the 14th Amendment." Video and testimony demonstrated that Mother had also choked Charles and hit him in the head. In addition to not complying with the court's requirement to complete domestic violence classes, Mother also failed to complete the necessary psychological evaluations. While it is true that Mother attempted to complete one, it is also undisputed that Mother refused to take steps

<hr>

petition was filed." *In re J.S.*, No. M2022-00142-COA-R3-PT, 2023 WL 139424, at *6 (Tenn. Ct. App. Jan. 10, 2023).

to complete a second evaluation after the trial court specifically ordered Mother to complete a second examination and even after the conclusion of her criminal proceedings. Mother also did not provide DCS with credible proof that she completed two parenting assessments, and, though she claims to have completed some, the trial court made an express credibility finding against Mother that is entitled to respect at the appellate stage.[7] *See, e.g., In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) ("[T]his court gives great weight to the credibility accorded to a particular witness by the trial court."). Finally, while Mother did physically attend family therapy sessions with Charles, she behaved in such a way that multiple witnesses came to separate conclusions that the therapy sessions were seriously harming Charles's recovery. These sessions were described as "toxic," and the trial court terminated them based on a finding that they were detrimental to Charles's health and well-being. Mother did not apply learned skills to contribute to progress via family therapy.

The permanency plans also placed a number of requirements on Mother that are reasonably related to creating an environment for Charles that would promote a healthy reunification of the family. For example, the permanency plans imposed conditions related to Mother's employment, budgeting, and housing status, largely to ensure safe and healthy housing for Charles. Mother was substantially in noncompliance with these requirements. Mother's housing situation only deteriorated after Charles left her care, and Mother has not demonstrated that she has a source of stable income from employment. While Mother testified that she is self-employed, the trial court did not find her testimony credible, and there was no independent proof at trial that Mother has a steady source of income. Mother refused to cooperate with DCS despite her plan requiring such cooperation with regard to these matters, which she regarded as none of DCS's business in spite of these requirements' clear relationship with Charles's well-being.

Viewing the requirements of Mother's permanency plan in their entirety, it is clear that the terms of the court-ordered plans were reasonable and that Mother took few steps to comply. She instead rejected the suggestion that she was responsible for harm to Charles. The goal of the permanency plan was to effectuate reunification, and Mother's behavior made that goal more unattainable. Accordingly, we conclude that the trial court did not err in finding that DCS established by clear and convincing evidence that Mother engaged in substantial noncompliance.

## B. Persistent Conditions

The trial court also found that clear and convincing evidence established that termination was justified based on persistent conditions. Under Tennessee's termination

---

[7] While Mother tried to introduce documentary evidence that she began completing the required parenting assessments and skills-based learning initiatives, the trial court excluded that evidence on the grounds that it was inadmissible hearsay.

statute, a parent's rights may be terminated for persistent conditions when:

> (3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
>> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>>
>> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
>>
>> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

Tenn. Code Ann. § 36-1-113(g)(3) (effective July 1, 2022, to May 4, 2023).

"The failure to remedy the conditions which led to the removal need not be willful." *In re Navada N.*, 498 S.W.3d 579, 606 (Tenn. Ct. App. 2016); *see also, e.g., In re B.D.M.*, No. E2022-00557-COA-R3-PT, 2023 WL 3019005, at *11 (Tenn. Ct. App. Apr. 20, 2023). "A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re Daymien T.*, 506 S.W.3d 461, 473 (Tenn. Ct. App. 2016) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)). Accordingly, "this termination ground is not dependent on a parent's efforts to improve the circumstances that led to a child's removal. Rather, the focus lies on the results of those efforts." *In re Jeremiah B.*, No. E2022-00833-COA-R3-PT, 2023 WL 2198864, at *8 (Tenn. Ct. App. Feb. 24, 2023); *see also In re Audrey S.*, 182 S.W.3d 838, 874 (Tenn. Ct. App. 2005) (noting that this "ground for termination [is] focused on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them").

As noted in addressing the substantial noncompliance ground for termination, Mother failed to complete the required domestic violence classes, psychological assessments, and parenting assessments and failed to apply learned skills to the family

therapy sessions.  The trial court found Charles's assertions of abuse to be credible and Mother's denials thereof to not be credible and her shifting of blame to be problematic. The record does not reflect that the concerns with Mother's behavior have been remedied, and her behavior in family therapy suggests there is little likelihood that Mother is working to remedy the conditions that warranted Charles's removal.

Additionally, Mother's housing situation proved to be a barrier to a safe return of Charles.  "This court has repeatedly identified a lack of stable housing as a basis for establishing the termination ground of persistent conditions." *In re Temperance A.*, No. M2023-00641-COA-R3-PT, 2024 WL 2891918, at *13 (Tenn. Ct. App. Jun. 10, 2024) (collecting cases), *perm. app. denied* (Tenn. Aug. 9, 2024).  The evidence at trial showed that Mother's housing condition had not improved, and it appeared to have deteriorated. Mother's shifting explanation and untruthful statements with regard to her housing status and her lack of cooperation with DCS suggest little likelihood of remedying the housing deficiency in the near future.

In addition to the persistent nature of these troubling conditions, it is clear that maintaining Mother's parental relationship with Charles prevents him from fully integrating into Foster Father's home.  Charles's return to Foster Father's care has been positive, and he continues to thrive in his new environment.  Foster Father signaled to DCS that he had an interest in adopting Charles and Charles testified at trial that he wishes to be adopted by Foster Father, but those efforts are impeded unless and until Mother's parental rights are terminated.

For the reasons discussed above, we find that the record supports the trial court's finding that clear and convincing evidence exists as to the persistent conditions ground for termination.

### C.  Severe Child Abuse

Shifting to the grounds found to support terminating Father's rights, the trial court found that the ground of severe child abuse applied in this case.  A parent's rights to his or her child may be terminated based on a finding of severe child abuse.  Tenn. Code Ann. § 36-1-113(g)(4).  Tennessee law supports termination under this ground in cases where,

> The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child . . . .

Tenn. Code Ann. § 36-1-113(g)(4) (effective July 1, 2022, to May 4, 2023).  By virtue of the statute's use of the word "any," there is no requirement that the abused child be the same child whose custody is at issue in the termination case.  *See, e.g., In re Jah'Lila S.*,

No. W2021-01199-COA-R3-PT, 2022 WL 4362839, at *10 (Tenn. Ct. App. Sept. 21, 2022) ("[T]ermination of parental rights on the grounds of severe child abuse against one child may serve as grounds for the termination of parental rights to the parent's other children.").

Courts look to the definition of "severe child abuse" included in Tennessee Code Annotated 37-1-102 to assess this ground. Tenn. Code Ann. § 36-1-113(g)(4). According to that section, "severe child abuse" can manifest through many different types of conduct, including "[t]he commission of an act toward the child prohibited by § 39-13-309, §§ 39-13-502 -- 39-13-504, § 39-13-515, § 39-13-522, § 39-13-527, § 39-13-531, § 39-13-532, § 39-15-302, § 39-15-402, § 39-17-1004, § 39-17-1005, or the knowing failure to protect the child from the commission of such an act toward the child." Tenn. Code Ann. § 37-1-102(b)(27)(C) (effective July 1, 2022, to May 4, 2023).

Two of the statutes listed in section 102(b)(27)(C) formed the basis for the trial court's finding of severe child abuse for Father: (1) Tennessee Code Annotated section 39-13-504, which is Tennessee's aggravated sexual battery statute; and (2) Tennessee Code Annotated section 39-13-522, which is Tennessee's child rape statute. Under the former, aggravated sexual battery

> is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:
>
> . . .
>
> (4) The victim is less than thirteen (13) years of age.

Tenn. Code Ann. § 39-13-504. Under the latter, "[r]ape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than eight (8) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522 (effective July 1, 2020, to Jun. 30, 2024).

Father was not convicted under these statutes or even in the state of Tennessee. Father was convicted under the state of Minnesota's criminal sexual conduct statutes, codified at Minnesota Statutes Annotated sections 609.342.1 and 609.343.1. The fact that Father was convicted of crimes in another jurisdiction does not hinder our analysis. It is well-established that Father's parental rights may be terminated based on foreign convictions for this ground so long as Father's acts in Minnesota were similarly prohibited by Tennessee law. *See, e.g., In re T.L.G.*, No. E2014-01752-COA-R3-PT, 2015 WL 3380896, at *4-6 (Tenn. Ct. App. May 26, 2015) (applying Ohio rape convictions to grounds (g)(4) and (g)(5)); *In re Roderick R.*, No. E2017-01504-COA-R3-PT, 2018 WL 1748000, at *14-16 (Tenn. Ct. App. Apr. 11, 2018) (applying California corporal injury convictions to grounds (g)(4) and (g)(5)).

- 23 -

Here, Father's parental rights were terminated under this ground based on his three Minnesota convictions. Two of Father's convictions stem from the unlawful sexual penetration of a child under the age of thirteen, which is prohibited by Tennessee Code Annotated § 39-13-522. Additionally, Father's third conviction stems from him engaging in unlawful sexual contact with a child who was eleven at the time of the event, which is prohibited by Tennessee Code Annotated § 39-13-504. Additionally, each of these convictions stem from orders of a Minnesota state court, meaning they all qualify independently as instances codified in "a prior order of a court" that support terminating Father's parental rights to Charles under Tennessee Code Annotated 36-1-113(g)(4). We agree with the trial court that DCS provided clear and convincing evidence that Father engaged in severe child abuse and, accordingly, we find no error in the trial court finding this ground for termination.

### D. Sentenced to Imprisonment for at Least Two Years for Severe Child Abuse

The trial court also concluded that Father's imprisonment stemming from an act of severe child abuse constituted a ground for termination. Under Tennessee law, a ground for termination exists where

> [t]he parent or guardian has been sentenced to more than two (2) years' imprisonment for conduct against a child that has been found under any prior order of a court or that is found by the court hearing the petition to be severe child abuse, as defined in § 37-1-102. Unless otherwise stated, for purposes of this subdivision (g)(5), "sentenced" shall not be construed to mean that the parent or guardian must have actually served more than two (2) years in confinement, but shall only be construed to mean that the court had imposed a sentence of more than two (2) years upon the parent or guardian . . . .

Tenn. Code Ann. § 36-1-113(g)(5) (effective July 1, 2022, to May 4, 2023).

The analysis of this ground is closely related to the analysis of Tennessee Code Annotated section 36-1-113(g)(4), as both turn upon convictions stemming from acts of severe child abuse. Father was convicted multiple times in Minnesota for actions that constitute severe child abuse. *See* Tenn. Code Ann. § 37-1-102(b)(27)(C). In each instance, Father received a sentence of at least two years. DCS provided the trial court with clear and convincing evidence to satisfy this ground.

### E. Sentenced to Imprisonment for at Least Ten Years When the Child is Less than Eight Years Old

Additionally, the trial court concluded that the length of Father's prison sentence and the time at which he was sentenced relative to Charles's age constituted a separate

ground for termination. Tennessee law provides a ground for termination exists where

> [t]he parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court . . . .

Tenn. Code Ann. § 36-1-113(g)(6) (effective July 1, 2022, to May 4, 2023).

Regarding Father's 2012 first-degree criminal sexual conduct conviction, the convicting court sentenced Father to a 153-month prison sentence, which amounts to nearly thirteen years of prison time. Charles was born in 2008, meaning he was less than eight years old at the time of sentencing. Based solely on those two facts, DCS provided sufficient evidence to satisfy the requirements for this ground. *See* Tenn. Code Ann. § 36-1-113(g)(6).

Father objects to this ground on the basis that he was ordered to enroll in Minnesota's sex offender program and enter indefinite civil commitment prior to having completed his sentence stemming from the 2012 offense. While Father argues that this ground should not be applied to him because he did not fully complete the relevant prison sentence, this ground turns on the sentence imposed by the court, not the actual amount of time served. *See* Tenn. Code Ann. § 36-1-113(g)(6); *In re Adoption of K.B.H.*, 206 S.W.3d 80, 85 (Tenn. Ct. App. 2006) (declining to "read ambiguity" into this ground based on the possibility that the convicted parent may not fully serve the imposed sentence); *In re Chandler M.*, No. M2013-02455-COA-R3-PT, 2014 WL 3586499, at *7 (Tenn. Ct. App. July 21, 2014) ("While the statute requires some period of confinement, the legislature did not expressly provide that the actual period of confinement must amount to 10 or more years. We decline to insert such a meaning into the statute when the obvious intention of the statute was to achieve permanency for children whose parents are subjected to the possibility of lengthy prison sentences."). As Father was imprisoned under a sentence that exceeded ten years when Charles was less than eight years old, the statutory requirements needed to sustain this ground are met regardless of the fact that Father did not complete his ten-year sentence before entering indefinite civil commitment. Accordingly, we affirm the trial court's ruling that DCS established this ground by clear and convincing evidence.

### F. Failure to Manifest an Ability and Willingness to Assume Custody

While the five previous termination grounds applied either to Mother or Father, but not both, for the final ground, the trial court found clear and convincing evidence that Mother and Father each failed to manifest an ability and willingness to assume custody of Charles. *See* Tenn. Code Ann. § 36-1-113(g)(14). We consider this finding as to both. To satisfy this ground, two prongs must be proven by clear and convincing evidence: "(1) the parent or legal guardian failed to manifest an ability or willingness to personally assume

legal and physical custody or financial responsibility of the child, and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020); *see* Tenn. Code Ann. § 36-1-113(g)(14).

The Tennessee Supreme Court has indicated the statute places a "conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *In re Neveah M.*, 614 S.W.3d at 677. Failure of the parent to manifest either ability or willingness will satisfy the first prong. *Id*. "Ability focuses on the parent's lifestyle and circumstances," while willingness revolves around a parent's attempts "to overcome . . . obstacles" preventing the parent from assuming custody. *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019). A parent's express desire to reunite with the child is insufficient to establish a willingness to assume custody. *See In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *17 (Tenn. Ct. App. July 15, 2019). To the contrary, "[w]hen evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). This court instead considers a parent's efforts to overcome any obstacles standing in the way of assuming custody or financial responsibility. *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (quoting *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019)). A failure to make efforts to overcome such obstacles "can undercut a claim of willingness." *Id*. As for the second prong, a substantial risk of harm requires "a real hazard or danger that is not minor, trivial, or insignificant" and requires the harm to be more than a "theoretical possibility," to be "sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001); *see In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018).

Turning first to Father, the trial court found that Father had neither the ability nor willingness to assume custody of Charles, and the trial court's findings concerning this ground are persuasive. Father is indefinitely confined in a sex offender program facility located at Moose Lake, Minnesota. Father did not testify, and there is no evidence in the record that he has taken any action whatsoever to make himself an able custodian of Charles. We agree with the trial court that Father is neither able nor willing to assume custody of Charles. Moreover, concerning the substantial risk prong, we also agree that Father through his confinement has no capacity to care for Charles and poses dangers in terms of his pedophilic actions. We agree with DCS that it provided clear and convincing evidence to support terminating Father's rights based on this ground.

Regarding Mother, the trial court found that she was neither able nor willing to assume custody of Charles. DCS provided ample proof that Mother currently lives in

unsuitable housing, which she has not taken any steps to improve throughout the pendency of this litigation. Mother has not taken steps to overcome or otherwise remedy the domestic violence concerns at the core of this case, and her conduct at the family therapy sessions and beyond demonstrate that, despite her wishes to reunite, she has not developed the skills necessary to safely care for Charles.

Regarding the risk of substantial harm, there is ample evidence in the record that Mother has engaged in violent behavior against Charles in the past and that she has not acted meaningfully to ensure that such conduct will not recur. Charles testified that Mother used a horsewhip, injuring him prior to November 8, 2021. The videos, pictures, and testimony in the record support the trial court's finding regarding Mother's abusive conduct in relation to the November 8th violent incident, which included choking and beating her son. Throughout the course of the therapy sessions, Mother engaged in aggressive behavior toward Charles, blaming him rather than accepting responsibility herself. Her behavior was so deleterious to her son that it resulted in her being escorted from the premises on more than one occasion. Following these interactions, which were designed to help Mother and Charles rebuild their parent-child relationship, Lebanon Academy officials reported that Charles would regress in his recovery. His cooldown sessions following these meetings were prolonged. The trial court terminated these sessions, and Mother's conduct that was harmful to her son was the animating force behind that decision. Ultimately, we conclude that clear and convincing evidence supports the trial court's determination as to the failure to manifest an ability and willingness ground for termination.

IV.

Having concluded that at least one statutory ground for termination of parental rights has been shown for each parent involved in this appeal by clear and convincing evidence, this court's focus shifts to what is in Charles's best interest. *See In re Audrey S.*, 182 S.W.3d 838, 876-77 (Tenn. Ct. App. 2005). The Tennessee Supreme Court has summarized the law regarding the best interest analysis as follows:

> Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests." When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ."

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017) (citations omitted).

Tennessee Code Annotated section 36-1-113(i)(1) provides a list of nonexclusive factors that guide our best interest inquiry. Those factors include:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1) (effective July 1, 2022, to May 4, 2023).

The trial court "[i]n determining whether termination of parental or guardianship rights is in the best interest of the child, . . . shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to," the factors referenced above. Tenn. Code Ann. § 36-1-113(i)(1). Regarding its analysis of the best interest factors, the trial court made extensive findings in the present case including the following:

> [] Pursuant to the best interest factor in Tenn. Code Ann. § 36-1-113(i)(1)(A), the effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority, the Court finds that Ms. Evans testified that Charles . . . is in a foster home with a foster parent who loves him. The Court has heard testimony this day [on] how well Charles has adjusted to his foster home with [Foster Father]. Charles testified that he wants to go through with this termination, and Ms. Evans testified that Charles wants to go through it as well. The Court finds it would be in Charles' best interests to have the rights of [Mother] and [Father] terminated. Specifically, [Mother] has made very little progress on the permanency plan. She has been hostile towards the Department. She has not taken responsibility for her actions. The psychological evaluation that she was requested a second or third time has not been complied with. The parenting assessment was never done. The family therapy that she and Charles had was just toxic.

> Ms. Amy Sherwin, [a former Lebanon Academy employee], testified that she has witnessed Charles in the foster home two or three times per month. She sees very positive interactions with [Foster Father]. The child is very relaxed, is at ease, and is safe. Charles has bonded with his foster parent. He is managing his anxiety well. He has learned coping skills and is excelling in school. Ms. Sherwin also said Charles is excelling in his home life under [Foster Father's] care. Charles' needs are being met. He feels safe and feels like a sense of stability is there when he is with [Foster Father]. This all promotes the permanency factor and effect that a termination of parental rights will have on the child's critical need for stability and continuity.

[] Pursuant to the best interest factor in Tenn. Code Ann. § 36-1-113(i)(1)(B), the effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition, the Court finds [Foster Father] is a pre-adoptive placement. Before that, Charles was at Lebanon Academy. Just prior to that, he was also with [Foster Father]. The Court finds from the testimony of Ms. Evans and Charles that Charles wants to be at [Foster Father's] home. The Court finds through the testimony of Ms. Amy Sherwin that it is a stable environment and Charles wants to be adopted by [Foster Father]. Given that stability and permanency, if Charles were to go back to [Mother], it would have a negative effect on him.

[] Pursuant to the best interest factor in Tenn. Code Ann. § 36-1-113(i)(1)(C), whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs, [Mother] testified that if she were to take Charles back, she would be living at a hotel. [Mother] has a restraining order against her from the house that she owns in Van Buren County, Tennessee. Her other residence is in Minnesota. Ms. Evans testified that [Mother] has not provided proper clothing for her own child. When asked to do so, [Mother] is irate. The foster parent is buying shoes for the child. Ms. Evans also testified that despite paying the token amount of child support, [Mother] has not provided anything else for Charles. [Mother] testified today that [her] income is roughly $1,250 and that [she] is self-employed, but [Mother] has never shown the Department any proof of this, despite Ms. Evans asking [Mother] over a dozen times and there being a request for production of documents and interrogatories. Regarding the education requirements, Ms. Evans testified that Charles has an IEP and at any IEP session, [Mother] does about 38 minutes of speaking in any 45 minute session. The Court finds this testimony credible. Ms. Evans testified that [Mother] yells, calls everyone liars, and is not focused on the IEP or the needs of Charles. Rather, [Mother] is screaming at educators. This demonstrates that [Mother] cannot provide for Charles' educational needs.

As to [Father], he is in an indeterminate commitment in Minnesota, so he cannot meet Charles' physical needs, educational needs, or material needs due to his incarceration.

[] Pursuant to the best interest factor in Tenn. Code Ann. § 36-1-113(i)(1)(D), whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment, our Court of Appeals has said this is

present date, not a reasonable expectation to create.[8] [Mother's] visits with Charles have been suspended due to [Mother's] outbursts. Mr. Donnelly and Ms. Gebhardt testified that there is no parental attachment or bond. In fact, the child became very nervous when [Mother] came to visit. During the visits, [Mother] would become so irate that they would have to take multiple breaks or terminate the visits early and it would take Charles 30 to 45 minutes to even an hour to decompress. He would have to take walks and speak with his therapists one-on-one. To the contrary, Mr. Donnelly and Ms. Gebhardt testified that while at Lebanon Youth Academy, if and when [Foster Father] came to visit, the child would get very excited and his eyes would light up.

Ms. Amy Sherwin testified that Charles has a much stronger bond with his foster parent versus [Mother]. Specifically, Ms. Sherwin said that since being with [Foster Father], Charles has been able to manage his anxiety, has learned coping skills, is excelling in school and in his home environment, and his needs are met. Charles seems a lot more stable. Since July of 2023, Ms. Sherwin has witnessed [Foster Father] and the child and she sees these interactions as very positive. Again, Charles appears to be very relaxed, is at ease, and feels safe.

As to whether the parent and child have a secure and healthy parental attachment, Ms. Gebhardt testified that the family therapy visits were detrimental. [Mother] used Bible verses to manipulate Charles. Ms. Gebhardt specifically testified that [Mother] did not have a secure parental attachment with her son. Ms. Gebhardt noticed that there was not a lot of love and affection. Charles would get upset because of his mother's behavior. She would embarrass him in front of other students and staff members at Lebanon Youth Academy. [Mother] would repeatedly say "Obey your parents. Obey your parents. Obey your parents." Ms. Gebhardt testified that during these family therapy sessions, all [Mother] wanted to do was talk about her rights being violated and how everyone else was doing things wrong, but was not taking any responsibility for herself.

Mr. Justin Donnelly testified that [Mother] threw a tantrum about not

---

[8] The trial court's language referencing factor (1)(D) in light of "present date" rather than "a reasonable expectation to create" is not entirely clear. Insofar as the trial court's language could be construed as precluding a showing that "there is a reasonable expectation that [Mother] can create" "a secure and healthy parental attachment," any error is harmless. The evidence clearly supports the trial court's analysis that a secure and healthy attachment did not exist between Charles and Mother, and the evidence and the trial court's other findings clearly indicated that there was no reasonable expectation of a secure and healthy parental attachment being created between Charles and Mother going forward.

being able to bring certain items of personal property into visits. He stated that the family therapy sessions were horrible, that [Mother] was unwilling to work on any skill sets, respect boundaries, or communicate effectively with Charles. [Mother] threatened to sue the staff, and she grabbed Charles' chair and made him look at her in one of his family therapy sessions. Specifically, Mr. Donnelly testified that he recommended stopping the session because no parental attachment could be obtained, which is directly related to this best interest factor.

Ms. Karolyn Getty from Lebanon Youth Academy also talked about the struggles that [Mother] had with building parental attachment with her son. Ms. Getty testified that she witnessed [Mother] being degrading towards the child. [Mother] even asked questions about Charles' intelligence, what his name was, if he knows who God is, and if he knows who the devil is. [Mother] used religion in a negative way during these family therapy visits. Ms. Getty also testified that [Mother] blamed Charles for things that were out of Charles' control, like animals that had passed away, stating that she, [Mother], was the only one who could work at the house since Charles was away. This also shows that there is no healthy parental attachment between the child and [Mother].

Regarding whether the parent and child have a secure and healthy parental attachment, [Father] is in an indeterminate sentence civil commitment in Minnesota, in a place for sexual offenders. No children would be allowed to go to that facility. This in and of itself prevents [Father] from having a healthy parental attachment because he is physically not able to and there is no release date.

[] Pursuant to the best interest factor in Tenn. Code Ann. § 36-1-113(i)(1)(E), whether the parent has maintained regular visitation or other contact and used it to cultivate a positive relationship with the child, [Father] is not physically able to visit or contact Charles because he is at the Minnesota Sex Offender Program. There was no testimony about any type of meaningful Zoom or Microsoft Meetings contact. In fact, Charles said that he has never had any relationship with his father during the pendency of this case or otherwise. The Court finds that [Mother] used visitation as a means of interrogation towards the Department, Lebanon Youth Academy, and other entities that were trying to help her. Any type of visitation, whether it be supervised or family therapy sessions that were done at Lebanon Youth Academy, were not productive and [Mother] did not use them to cultivate a positive relationship with the child. The testimony from Ms. Gebhardt, Mr. Donnelly, and Ms. Getty were all consistent in that the family therapy sessions were "horrible" in the words of Mr. Donnelly, and "toxic" in the

words of Ms. Getty, and it was all attributed towards the behavior and the attitude to [Mother]. Sessions had to be terminated early because of [Mother's] irate behavior, badgering staff, and even badgering Charles.

The last time that [Mother] had any visitation with Charles was in June of 2023. The Court finds that when there was visitation, it was regular but was not used to cultivate a positive relationship with the child, and the Court places the fault on [Mother].

[] Regarding the best interest factor in Tenn. Code Ann. § 36-1-113(i)(1)(F), whether the child is fearful of living in the parent's home, the videos in the exhibits to this hearing speak for themselves. Charles testified that he was afraid to go back and live with [Mother]. Specifically, he testified that the video showed that [Mother] grabbed Charles by the ear and yanked him around. Charles testified that [Mother] was pulling his ears and then moved to his neck. Charles testified that he could not breathe while she was strangling him. There was a video that showed [Mother] holding Charles down on his bed. There were pictures introduced that there were multiple bruises on Charles' legs and a bruise on his arm. The child did testify that one bruise, that the Court did not see, in the rib cage area was from a dirt bike accident. Other bruises, the Court finds, were due to the domestic abuse by [Mother]. Charles also testified that [Mother] used a horsewhip, swung the whip at him, and hit him. This happened while the family was still in Minnesota.

[] Regarding the best interest factor in Tenn. Code Ann. § 36-1-113(i)(1)(G), whether the parent, the parent's home, or others in the parent's household trigger or exacerbate the child's experiences of trauma or post-traumatic symptoms, Counselor Gebhardt testified that when Charles was in therapy, he needed a lot of time to process information. Charles was sexually assaulted by another youth in the foster home. The youth was removed immediately from the home. Charles had flashbacks and nightmares about that. Charles is going through counseling and Counselor Gebhardt also testified that Charles was traumatized by his mother and had flashbacks and nightmares of her hitting him, but Charles has made great improvements with this. The Court does find it unfortunate that the child in [Foster Father's] home committed these acts to Charles, but the Court does find that [Foster Father] did the appropriate thing by immediately contacting DCS and the perpetrating child was removed.

The Department did not know during the pendency of this case what other people would be in [Mother's] home because [Mother] would never divulge her address. She would never allow for any type of information, such

- 34 -

as what kind of residence she was living in, how many people were residing there, and what the condition of the home was. She did testify today that although there is a restraining order that prevents her from going back to her Spencer, Tennessee residence, she is couch surfing. She testified that she is also living in Minnesota with a lady, [name omitted], that the Department does not have any information on.

[] Regarding the best interest factor in . . . Tenn. Code Ann. § 36-1-113(i)(1)(H), whether the child has created a healthy parental attachment with another person or persons in the absence of the parent, Charles states that he calls [Foster Father] "dad." Charles wrote a letter stating that he wanted to be adopted by [Foster Father], and that he calls [Foster Father] "dad." Counselor Gebhardt also testified that Charles prefers to see [Foster Father], the foster parent, over [Mother] and that Charles would light up when [Foster Father] would come to Lebanon Youth Academy, but Charles would always be scared, fearful, and dreadful when [Mother] came to visit.

Mr. Donnelly testified that in his professional opinion, [Mother] viewed Charles as property and not as a person.

[] The best interest factor found in Tenn. Code Ann. § 36-1-113(i)(1)(I), whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, the likely impact of various available outcomes on these relationships, and the child's access to information about the child's heritage, no proof was presented as to this best interest factor.

[] The next best interest factor, Tenn. Code Ann. § 36-1-113(i)(1)(J), is whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner. [Mother] testified that she still has two pending disorderly conduct charges. However, the Court does not hold this against [Mother]. However, Ms. Evans testified that [Mother] provided no information as to her housing arrangements. The Court does not know if [Mother] is living in a one, two, or three bedroom house. No background checks have been done on any residences. The Court does not know the outcome of any background checks on [name omitted], with whom [Mother] is living in Minnesota. [Mother] testified to couch surfing. It is impossible for the Department to do any background checks on that. The Court does not know the outcome of [Mother's] mental health

assessment or psychological assessment that was ordered on two or three different occasions because [Mother] has not completed these. Ms. Evans has testified, and rightly so, that [Father] put himself in a situation and perpetrated and committed these serious sexual offenses against children. The Department did not do that. He did that on his own free will. He certainly has a history of criminal activity, and he is also in a civil commitment with an indeterminate release date. The Court does not even know when [Father] would be released, and this Court certainly would not put Charles back with a man who has been convicted of these heinous sexual crimes and someone Charles does not even have a relationship with.

[] Regarding the best interest factor in Tenn. Code Ann. § 36-1-113(i)(1)(K), whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions, the Court finds that [Mother] did not take advantage of the services that were offered by the Department, specifically as to the two psychological assessments that were funded post her first one that she never completed. [Mother] has never done the mental health assessment or the domestic violence classes. The proof shows she has not done the parenting assessment either. [Mother] has had plenty of opportunity to complete these steps but has not. She did not do the domestic violence classes before or after her trial on the domestic assault in Van Buren County, which was done in September of 2023. After her trial, she has had September, October, November, and now we are in December. She has had plenty of time to start the domestic violence classes and has chosen not to.

Ms. Evans testified that [Mother] refused parenting classes. [Mother] offered to get services on her own but did not sign any releases or provide any proof of completing the services. Ms. Evans testified as to Health Connect and Cheer Mental Health. That information was given to [Mother] and again, the Court emphasizes the proof shows that [Mother] did not sign any releases [indicating] if she had done any of these steps on her own without the Department. Since releases were not given by [Mother], the Department does not know if any of the steps were completed by [Mother].

The family therapy at Lebanon Academy in the words of Mr. Donnelly was "just horrible" and in the words of Ms. Getty, "very toxic." This is all because of [Mother's] unwillingness to cooperate or take responsibility, blaming others for her actions, and embarrassing Charles in front of other children and staff members while at Lebanon Academy about being sexually assaulted. [Mother] was degrading towards Charles and the staff. Again, instead of using these services to benefit her case, [Mother] used them to the detriment of her case.

[] The next best interest factor is Tenn. Code Ann. § 36-1-113(i)(1)(L), whether the Department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the Department. This is outlined in the Affidavit of Reasonable Efforts the Court adopts. Also, specifically, Ms. Evans pointed out under oath that the psychological assessment that was done in December of 2021 was incomplete because the provider wanted to have more information about the pending criminal charges. A second and third round of funding was approved. Ms. Evans testified that she gave [Mother], either directly or by and through the [GAL], the phone number of [the provider] and that [Mother] never got it completed.

[] Best interest factor Tenn. Code Ann. § 36-1-113(i)(1)(M) is whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstances, conduct, or conditions that made an award of custody unsafe and not in the child's best interests. The Court recognizes that [Mother] was acquitted in her criminal trial for domestic assault but recognizes that there is a different standard and lower burden of proof for dependency and neglect cases. [Mother] adjudicated dependency and neglect at the preliminary hearing. The [Court] finds that the child was dependent and neglected based on [Mother's] actions, and [Mother] did not demonstrate a sense of urgency in addressing the conditions that precipitated this finding. [Mother] testified that she purposefully put off domestic violence classes because of her criminal trial. The Court respects that, but the trial was in September and it is now December and [Mother] has not shown any proof of the domestic violence counseling. [Mother] did one psychological assessment. Two others were paid for, but [Mother] did not go to either of those. [Mother] has not shown proof of a parenting assessment. [Mother] has just not shown the urgency to regain custody of her child. Ms. Evans testified that [Mother] never took accountability for her actions or participated. [Mother] has never shown proof of safe and stable housing. [Mother] has chosen to act inappropriately towards the Department, the child, school counselors on the IEP, and the foster parent, which shows [Mother] has not demonstrated a sense of urgency that she wants her child back.

[] Best interest factor Tenn. Code Ann. § 36-1-113(i)(1)(N) is whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse toward the child or any other child or adult. The Court will start with [Father]. [Father] pled [guilty] to two counts of very violent sexual crimes. He received a 153 month sentence in a Minnesota penitentiary

and is now in a Minnesota facility for sexual offenders on a civil commitment with an indeterminate sentence. This shows that [Father] is not appropriate to take custody of the child. [Father] pled guilty to sexually assaulting two children, one of which he impregnated. As to [Mother], she has been noncommunicative with the Department about anyone else residing with her in the home. The Court finds that the psychological abuse that [Mother] has inflicted on the child, by the testimony of Ms. Evans, Mr. Donnelly, Ms. Gebhardt, and Ms. Getty, shows that [Mother] is not in a position to regain custody of the child.

[] Best interest factor Tenn. Code Ann. § 36-1-113(i)(1)(O) is whether the parent has ever provided safe and stable care for the child or any other child. Ms. Evans testified that today, we are in a worse position than we were in 2021, when Ms. Evans knew that [Mother] was residing at her Spencer, Tennessee address. Up until today, until [Mother's] testimony, we did not know where [Mother] was residing. We did not know who was living with [Mother]. The Department did not know if it was a one-room apartment or a ten-room house. As to [Father], Ms. Evans testified through certified criminal records from Minnesota that [Father] was found guilty of two horrific sexual offenses, one on an 11 year old girl and one on a 12 year old girl who were siblings. He was dating their mother and instead of parenting those two girls, he was abusing them.

[] The next factor, Tenn. Code Ann. § 36-1-113(i)(1)(P), is whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive. The testimony from Ms. Evans, Mr. Donnelly, [Charles], Ms. Amy Sherwin, Ms. Gebhardt, and Ms. Getty all shows that [Mother] does not know what she needs to work on because she is too busy talking, interrupting, and blaming others. Ms. Evans testified that it is more than just words that matter. It is her actions and choosing not to work with the Department and not to follow the permanency plan. It was [Mother's] actions that caused a suspension of the family therapy and the supervised visitation while the child has been in foster care. [Father] has never demonstrated [knowledge of] the basic needs to care for Charles. Today was the first time Charles has ever seen him.

[] Best interest factor Tenn. Code Ann. § 36-1-113(i)(1)(Q) is whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive. [Father] is in a lockdown facility with an indeterminate sentence, filled with people who abuse others. This would not be an appropriate place for Charles to live. [Father] is part of the Minnesota Sex Offender Registry Program. The Court would never approve a child

- 38 -

going back to [Father]. As to [Mother], the testimony is replete. [Mother] has not demonstrated an ability or commitment to create a home that fosters Charles' best interests. Charles testified that he is scared of [Mother]. Charles and his counselors testified that Charles would get scared when [Mother] would come to visit. [Mother] would embarrass him at Lebanon Youth Academy. Before Charles came into foster care, he was in in-school suspensions, had multiple fights, and got kicked out of the Boys and Girls Club. He went to Lebanon Youth Academy and came back to live with [Foster Father]. Charles now behaves well and expresses his emotions. He is doing great with his mental health and education. Charles has a sense of permanency and he deserves that. Ms. Gebhardt testified that [Mother] is not able to provide the love and affection that Charles needs and that is part of creating that atmosphere in which he can thrive.

[] The next factor, Tenn. Code Ann. § 36-1-113(i)(1)(R), is whether the physical environment of the parent's home is healthy and safe for the child. [Father] is in a sex offender facility. This would not be appropriate for Charles. If [Father] were to get out, the Court certainly would not approve him having any type of custody of Charles based on his criminal record. [Father] has not worked any of the program and failed to provide any releases to Ms. Evans when asked.

As to [Mother], Ms. Evans requested on more than a dozen occasions that [Mother] give her address and provide information about housing, but [Mother] failed to do that. [Mother] testified that sometimes she couch surfs, that she is restrained from going to her home in Van Buren County, which is on appeal, but her only residence is with a friend in Minnesota. [Mother] is either couch surfing or in a hotel.

[] The next factor, Tenn. Code Ann. § 36-1-113(i)(1)(S), is whether the parent has consistently provided more than token financial support for the child. Ms. Evans and [Mother] testified that [Mother] has been paying $65 per month in child support and the Court applauds this. The Court recognized that $65 a month is not enough to care for the child. Ms. Evans testified that Charles can eat $65 in one week. The testimony showed that any clothes [Mother] tried to provide for Charles were not the right size. [Mother] did not buy him a book bag, pencils, or any type of school supplies.

[] The last best interest factor, Tenn. Code Ann. § 36-1-113(i)(1)(T), is whether the mental and emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child. [Mother] has demonstrated that she wants to blame other people including

the Department, even her attorney, Lebanon Academy, [Foster Father], and school counselors, and did not take any responsibility for herself. The Court finds that [Mother] is not mentally or emotionally fit to care for the child and returning custody back to her would be detrimental to Charles.

With respect to [Father], the Court record indicates through certified copies from Minnesota that [Father] has unresolved behavioral issues. He is in an indeterminate commitment in a sex offender facility in Minnesota, and is extremely dangerous to society. There were questions that he may not be able to do supervised probation.

[] The Court also finds that since this matter was filed in February of 2023 and the underlying dependency and neglect action dates back to 2021, the Department has done everything it can to try and reunify the child with [Mother].

[] The child deserves permanency and stability

Conducting our own review of the record and the factors pursuant to the standard set forth above, we consider first Charles's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning the need for stability), (B) (concerning how changes in caretakers affect child well-being), (D) (concerning parent-child attachment), (E) (concerning visitation), (H) (concerning attachment to others), (I) (concerning relationships with others), (T) (concerning the parent's fitness and its corresponding impacts). One aspect of this case that sets it apart from many other parental termination cases is that Charles presented the trial court with a clear articulation of his feelings about this case and what outcome he desired. There is a fine balance to be drawn in considering that testimony. A trial court cannot allow a child to unilaterally decide the outcome of the best interest analysis, particularly considering that a child's testimony could be inappropriately influenced by outside factors, such as favoritism toward one parent.[9] *See, e.g., In re Taylor A.B.*, No. W2013-02312-COA-R3-PT, 2014 WL 3778749, at *7 n.7 (Tenn. Ct. App. July 31, 2014) (advising "that 'due caution is in order in considering the testimony of a child' on his preference, to guard against factors such as an adult pressuring a child into expressing a particular preference" (quoting *Maxwell v. Woodard*, No. M2011-02482-COA-R3-CV, 2013 WL 2420500, at *18 (Tenn. Ct. App. May 31, 2013))). However, at the same time, "provided the trial court exercises due caution, 'it is permissible, indeed important, to give significant weight to the child's testimony' on his own best interests," particularly if the child is old enough and demonstrates the maturity needed to do so. *In re Taylor A.B.*, 2014 WL 3778749, at *7 (quoting *Maxwell*, 2013 WL 2420500, at *18) ("Under the facts of this case, where Father took the life of the mother of

---

[9] It is worth reiterating that, during cross examination, Charles emphatically denied receiving any pressure or undue influence from anyone in drafting his letter to the court.

these children, the trial court appropriately considered and respected the children's desire to see Father's parental rights terminated, freeing them to be adopted by the Petitioners. We do as well."); *see also In re Braxton M.*, 531 S.W.3d at 738 (finding no error in the trial court crediting a maternal grandmother's statement that the child "personally told me . . . he wants to be adopted and this is where he wants to be, and he, that he loves it at home. He's happy where he's at and he does not want to go with his mother or his father, and he has personally told me that.").

Here, Charles, demonstrating considerable bravery and maturity, spoke directly to what he believed would be in his best interest by reading the following hand-written letter aloud in court:

> Dear reader[,] what I want to happen is I want to stay with [Foster Father] and would like to be adopted by him[.]  I would still talk to my mom and love her but she would not have rights anymore[.]  My mom had me [for] 13 years and in six months [Foster Father has] done more for me and showed more love than in 13 years[.]  He never let anyone hurt me after [the other foster child.]  He protected me[.]  He sent me to Lebanon [Academy] out of love and wanted me to get help with my anger and behavior and even took me back after everything I did and still shows me a lot of love and I love him with all my heart.

Charles's letter speaks directly to the best interest factors that are tied to his emotional needs and well-being.  His letter strongly supports the conclusion that terminating Mother's and Father's parental rights would provide stability for Charles and support his well-being. The evidence presented offered clear support for the correctness of Charles's own observations regarding his emotional needs and well-being and the deleterious impact of Mother thereupon.  The evidence presented to the trial court reflected the harm caused by Mother and Father to Charles as well as the support provided by Foster Father that has helped him to move forward.  Simply stated, these factors support termination.

Regarding support and knowledge of Charles's needs, the trial court also found that these factors support termination.  Tenn. Code Ann. § 36-1-113(i)(1)(S) (addressing parent providing more than token support); (P) (addressing parent's understanding of the child's needs).  Factor (P) favors terminating both Mother's and Father's parental rights.  There is no proof in this record demonstrating that Father has any understanding of Charles's status or his specific needs.  There is no indication that Father knows that Charles has an IEP and requires more academic attention under that plan.  While Mother is aware of Charles's status, it is not clear that Mother actually understands Charles's needs.  Mother's actions related to addressing Charles's needs whether with DCS, Lebanon Academy officials, or school officials unfortunately reflect a keener appreciation of her own needs and a lesser understanding of Charles's actual needs.  We agree with the trial court that this factor favors terminating Mother's parental rights.

Additionally, concerning factor (S), the only suggestion that Father has been providing support for Charles appears to be the language in the paternity order indicating that Father's future income might be withheld to support Charles's future development. Yet, Father has, as far as the court is aware, not worked for an extended period of time due to his imprisonment. In his briefing to this court, Father did not suggest he had been previously employed or submitted any form of child support to Charles in the past either. Father had the burden of proving that any support payments he made, if any exist, exceeded the definition of token support, but failed to present any argument to that effect.

However, we cannot agree with the trial court's decision to hold factor (S) against Mother solely on the basis of Ms. Evans's testimony. Ms. Evans conceded that Mother consistently paid $65 per month to DCS in support of Charles, which was the court-ordered support obligation placed on Mother. According to the parental termination statute, support is only presumptively "token" in nature "if it is less than the amount of the minimum child support order established by the department of human services child support guidelines." Tenn. Code Ann. § 36-1-102(1)(B). Here, Mother met her court-ordered child support obligation, and DCS provided no evidence that Mother's contribution was "insignificant given [Mother's] means." *See id.* In fact, DCS spent most of trial contending it was unaware of Mother's means to support. Because DCS failed to meet its burden of demonstrating that Mother's decision to abide by the terms of a court order mandating $65 per month of child support was "token" under the circumstances, we must conclude that this factor weighs against terminating Mother's parental rights.

We turn next to considerations of Charles's physical environment and well-being. *See* Tenn. Code Ann. § 36-1-113(i)(1)(F) (involving the child's fear of the parent's home), (G) (involving whether the child's trauma is triggered or exacerbated by being in the parent's home or with parent), (N) (involving any abuse or neglect present in the parent's home), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the child's needs), (R) (involving the health and safety of the home). Being confined, Father argues that Charles should be returned to Mother's custody, so the focus of these factors falls on Mother's home environment. As was discussed in the analysis above, Mother's housing situation was deemed untenable shortly after DCS obtained custody of Charles. Throughout the duration of this matter, Mother has failed to remedy her housing situation; in fact, the record evidence suggests that her housing situation has only worsened. Also, the abuse and neglect that spawned this parental termination action took place in Mother's home. While Charles did not testify as to whether he associates the specific house Mother lived in at the time of separation with his trauma, there was testimony that Charles still experiences lingering trauma associated with the events that took place in the Spencer, Tennessee house. Furthermore, interactions with Mother exacerbated Charles's symptoms. As for housing, even if Mother could, as she originally suggested, maintain that the Spencer, Tennessee home could be considered her current Tennessee residence, Ms. Evans

described poor health conditions in the home that would stand in the way of it being considered a safe environment for Charles. We agree with the trial court that these factors weigh in favor of termination.

Next, we consider the parents' efforts. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (involving the parent's continuity in meeting the child's needs), (J) (involving the parent's lasting adjustment of circumstances), (K) (involving the parent's use of available resources), (L) (involving DCS's reasonable efforts), (M) (involving parent's sense of urgency in addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest). Concerning Father first, almost every witness tied to DCS and Lebanon Academy conceded at trial that they did not attempt to communicate with Father about Charles. When officials suggested to Charles that he could try and develop a relationship with Father, Charles declined after learning about Father's criminal record. Notwithstanding these officials' unwillingness to incorporate Father into Charles's life, his imprisonment has made it impossible to provide for Charles. While Father has completed one or two classes during his confinement, that appears to be the extent of his efforts to improve his condition. Father appears to be indefinitely confined. Meanwhile, Mother has been offered DCS resources multiple times throughout the case and denied those offers of assistance. Mother rejected any suggestion that she should complete more than one psychological evaluation, take domestic violence classes, or improve her housing situation. Mother's efforts in the therapy and educational environments can only be described as counterproductive. At the core of this case was concern that Mother could not safely parent Charles without exposing him to risks of abuse, and Mother's apparent hostility towards taking steps to alleviate those concerns indicates that these factors weigh in favor of termination of Mother's rights.

In considering the best interest of a child, Tennessee courts must not merely "tally[]" the statutory factors but analyze the weight and relevance under the facts and circumstances of the case. *In re Gabriella D.*, 531 S.W.3d at 682; *see also In re B.D.M.*, No. E2022-00557-COA-R3-PT, 2023 WL 3019005, at *15 (Tenn. Ct. App. Apr. 20, 2023). "Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case." *In re Gabriella D.*, 531 S.W.3d at 682.

We agree with the trial court that terminating Father's parental rights is in Charles's best interest. The record indicates that Charles has no real relationship with Father and that when Charles was presented with the opportunity to try and seek out such a relationship, he rejected the idea after conducting an online search and learning about Father's disturbing criminal history. Father remains indefinitely confined at Moose Lake, and the record is replete with information concerning Father's predatory history with children. The best interest analysis turns on what is best for the child, and the record clearly indicates by clear and convincing evidence that terminating Father's parental rights is in Charles's best interest.

- 43 -

Regarding Mother, it appears that nothing has fundamentally changed since November 8, 2021. While Mother was acquitted shortly before trial of her criminal domestic violence charge, the unappealed conclusion at the dependency and neglect stage that Mother perpetrated violence against Charles and the testimony and exhibits in the present case both support the trial court's conclusion that Mother violently choked Charles and committed other acts of violence against him on November 8th. The evidence also reflects that this was not the first instance of violence perpetrated against Charles by Mother. Unfortunately, despite significant efforts by DCS and Lebanon Academy, Mother's ability to interact positively with Charles remains unimproved, as evidenced by the failure of the family therapy session at Lebanon Academy and underscored by Charles's testimony at trial. In terms of being able to provide for Charles financially, Mother's ability is unknown, as the trial court found Mother's statements about her self-employment and income not credible. As for housing, Mother's housing situation appears to have worsened since 2021.

Conversely, Charles's well-being has improved considerably since he departed Mother's care. Charles received significant, individually tailored attention and care from the staff at Lebanon Academy. Whereas Charles reported anger issues and poor academic performance entering that facility, he left having made dramatic improvements and progressing significantly with overcoming those obstacles. From his own testimony and the testimony of those who are aware of his current living conditions with Foster Father, Charles continues to improve emotionally and academically under Foster Father's care.

Charles is to be commended on his efforts to persevere and overcome the adversity that life has put in front of him; his efforts have been impressive. With regard to the best interest analysis, simply stated, the record provides clear and convincing support for the trial court's conclusion that termination of Mother and Father's parental rights is in Charles's best interests.

V.

In considering the arguments advanced on appeal and for the reasons discussed above, we affirm the judgment of the trial court. The costs of the appeal are taxed equally to the appellants, Michael C. and Lisa T., for which execution may issue if necessary. The case is remanded for further proceedings.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE